In the

# United States Court of Appeals

## For the Seventh Circuit

No. 00-3700

METALLGESELLSCHAFT AG and
MGTS UK HOLDING,

*Plaintiffs-Appellants*,

*v.*

SUMITOMO CORPORATION OF
AMERICA, SUMITOMO CORPORATION,
YASUO HAMANAKA, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00-C-040-C, MDL Docket No. 1303—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 5, 2001—DECIDED MARCH 31, 2003

Before CUDAHY, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* This case is part of the broader multi-district litigation that was spawned by an alleged conspiracy involving Sumitomo and others to raise the price of copper and manipulate the London Metals Exchange (LME). The plaintiffs, Metallgesellschaft AG (MG) and MGTS UK Holding (MGUK), both short-sellers that bought copper futures contracts from brokers in New York, Connecticut, and London, claim that they were injured by this conspiracy when Sumitomo Corpora-

tion (Sumitomo), along with Global Minerals and Metals Corporation, Inc. (Global) and other defendants in this case, cornered the market for physical copper available to satisfy copper futures contracts on the LME. They allege that the purpose of the conspiracy was to "squeeze" the LME shorts (parties with the obligation to sell copper to others) by cornering the supply of copper available in LME warehouses as well as LME warrants and thereby forcing the shorts to cover their positions at greatly inflated prices.

The plaintiffs brought claims under the Sherman Act, 15 U.S.C. §§ 1 and 2; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1341, 1343 and 1962; N.Y. GEN BUS. LAW § 340; and state common law of fraud. The district court dismissed the action, finding that (1) the court did not have "subject matter jurisdiction" over the plaintiffs' claims, because of the limitations found in 15 U.S.C. § 6a, the Foreign Trade Antitrust Improvement Act of 1982 (FTAIA) and (2) the plaintiffs did not have standing under § 4 of the Clayton Act. We find, contrary to the district court, that the requirements of the FTAIA were satisfied. The issue of the plaintiffs' right to recover (called "standing" below) also requires further consideration in the district court. We therefore reverse the judgment and remand for further proceedings.

# I

Although the United States is the second largest copper cathode producer and the largest consumer of copper cathode in the world, some 90 to 95% of the world's copper futures contracts are traded on the LME. Whether trades are made by open-outcry or by telephone, all LME contracts are denominated in U.S. dollars. There is an open-outcry system on the trading floor of the LME, but most American trading is interoffice trading through brokers

in New York, who make their deals and then communicate the results via telephone or e-mail to brokers in London. Through this process, called matching, all U.S. trades are made on a 24-hour basis, with real time price quotes available. They are matched by an LME broker in London and then cleared through the London Clearing House in London. Although American trades on the LME are subject to regulations according to English law, they are also regulated by the U.S. Commodity Futures Trading Commission (CFTC).

Because the details of the Sumitomo conspiracy to inflate the price of copper can be found in our opinion in *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002), we will not rehash them here. The important points for this appeal are the identity and market role of the plaintiffs now before us, all of whom claim that they were injured by the alleged conspiracy. Plaintiff MG is a German-based corporation, and plaintiff MGUK is a British subsidiary of MG. MG is the assignee of claims of Metal Concentrates International Inc. (MCII), a New York-based, Delaware Company. MGUK is the assignee of the claims of MG Metal & Commodity Ltd (MGM), a London-based copper merchant. MG and MGUK assert that they were forced to cover their short positions by tendering high-priced warrants and physical copper cathode to various LME warehouses, including one in Long Beach, California. As a result, the short-sellers paid an overcharge for the physical copper (which they would not have had to procure had it not been for the conspiracy) and incurred additional freight and handling costs associated with their California deliveries.

The plaintiffs brought this suit in January, 2000. On October 3, 2000, the district court granted the defendant's motion to dismiss, which was based on both FED. R. CIV. P. 12(b)(1) and 12(b)(6), finding that the plaintiffs had not established jurisdiction under the standards of

the FTAIA. The district court determined that claims raised by the "mostly foreign plaintiffs who were injured abroad by effects felt abroad and not in American markets" did not fall within the requirements established by the FTAIA for suits brought under the Sherman Act. This lack of jurisdiction also implied, the district court thought, that the plaintiffs were not entitled to sue under § 4 of the Clayton Act.

## II

This court, sitting *en banc*, has recently concluded that the FTAIA establishes limits on the "subject matter jurisdiction" of the district courts, rather than describing a limit on the legislative jurisdiction Congress has exercised in foreign commerce antitrust cases. See *United Phosphorus, Ltd. v. Angus Chem. Co.*, No. 01-1693, 2003 WL 910592 (7th Cir. Mar. 10, 2003). That is also the way the district court viewed the case. We therefore turn immediately to the question whether the conclusion the district court reached on the facts of this case was correct.

Our starting point is the language of the statute. In pertinent part, it reads as follows:

Sections 1 to 7 of this title [Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.

Sumitomo and Global, relying on this statute, filed a motion seeking dismissal of the action. They argued that the plaintiffs' complaint has not asserted that there is conduct that has a "direct, substantial, and reasonably foreseeable effect" on either U.S. domestic commerce or on U.S. import commerce. It is important in this respect to note that the district court did not make jurisdictional findings of fact about the amount or nature of commerce affecting U.S. markets; its analysis was done as a matter of law, and we are thus free to review it *de novo.*

The first important question is what exactly Congress meant when it used the phrase "direct, substantial, and reasonably foreseeable effect" on "trade or commerce (other than import trade or import commerce) with foreign nations." At least two possible interpretations exist. The first, which the district court adopted, reads the statute as imposing a two-fold requirement: the conduct must affect the U.S. domestic marketplace, and the plaintiff's injuries must arise out of the very same anticompetitive effect on the marketplace. See *In re Copper Antitrust Litig.*, 117 F.Supp.2d 875, 883 (W.D. Wis. 2000); see also *Den Norske Stats Oljeselskap As v. HeereMac v.o.f.*, 241 F.3d 420 (5th Cir. 2001), *cert. denied sub nom., Statoil ASA v. HeereMac v.o.f.,* 534 U.S. 1127 (2002). The second draws a distinction between the effects on U.S. commerce that are necessary to support statutory coverage and the effects that would support the merits of a particular plaintiff's claim. See, *e.g.*, *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338 (D.C. Cir. 2003); *Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002). According

to the plaintiffs, who obviously support the latter interpretation, the FTAIA requires only that there be conduct that has "direct, substantial, and reasonably foreseeable" anticompetitive effects in the United States, whether or not the plaintiff's claim is based on those effects. They rely, for example, on *Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978), which the drafters of the FTAIA expressly noted that they had no intention to overrule or to undermine, see H. REP. NO. 97-686, at 11-12 (1982). In *Pfizer,* the Supreme Court recognized the right of the Government of India to sue for its injuries from antitrust violations that affected both the U.S. market and the Indian market.

There is currently a conflict in the circuits between the narrow interpretation, favored by the Fifth Circuit majority in *Den Norske*, and the broader interpretation, which the District of Columbia followed in *Empagran* and *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998), and the Second Circuit adopted in *Kruman.* Thus, whatever position this court adopts, if and when the need arises, will simply be a matter of choosing sides on an existing issue.

The Fifth Circuit's decision in *Den Norske* is the leading authority at present for the stricter test, under which the anticompetitive effects in the United States must be the same effects as those supporting the plaintiff's claim. In *Den Norske*, the plaintiff ("Statoil") was a Norwegian oil corporation that conducted business in the North Sea. Statoil alleged that it had been injured by a global conspiracy that inflated its operating costs. Like the district court in this case, the Fifth Circuit granted a motion to dismiss for lack of "subject matter jurisdiction" and decided that § 2 of the FTAIA meant that "the higher prices paid by United States companies for heavy-lift services in the Gulf of Mexico—must give rise to the claim that Statoil asserts against the defendants." *Id.*

at 427. The court further noted that the Sherman Act does not cover foreign transactions between foreign entities, which was enough to eliminate any remaining U.S. antitrust claim the plaintiffs might have had. *Id.* at 426. Judge Higginbotham dissented on exactly this point, observing that he was "not persuaded that when illegal conduct produces these domestic effects [as described in the FTAIA], that Congress intended to close the door to a foreign company injured by the same illegal conduct. That was not the law before this effort to assist American business abroad, and Congress did not intend to change it or do so unwittingly." *Id.* at 431.

The D.C. Circuit, which had already essentially come to the opposite conclusion in *Caribbean Broadcasting*, made its position clear in *Empagran*, in which the court had the following to say on this point:

> We hold that where the anticompetitive conduct has the requisite harm on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct's effect on foreign commerce. The anticompetitive conduct itself must violate the Sherman Act and the conduct's harmful effect on United States commerce must give rise to "a claim" by someone, even if not the foreign plaintiff who is before the court. Although the language of § 6a(2) does not plainly resolve this case, we believe that our holding regarding the jurisdictional reach of the FTAIA is faithful to the language of the statute. We reach this conclusion not only by virtue of our literal reading of the statute, but also in light of the statute's legislative history and underlying policies of deterrence emanating from the Supreme Court's decision in *Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978).

315 F.3d at 341.

In so holding, the D.C. Circuit expressly recognized the circuit split between the Fifth Circuit's *Den Norske* decision and the Second Circuit's *Kruman* decision, and, while not fully endorsing every word of the Second Circuit's test, it described itself as "somewhat closer" to the Second than to the Fifth Circuit. 315 F.3d at 350. In *Kruman*, the Second Circuit held that if foreign anticompetitive conduct has the necessary "direct, substantial, and reasonably foreseeable effects" on the U.S. domestic market, the defendants fall within the reach of the U.S. antitrust laws, without any further showing. The *Kruman* court found that the FTAIA did not alter existing standards of antitrust law, as outlined in that court's 1981 opinion, *National Bank of Canada v. Interbank Card Assoc.*, 666 F.2d 6, 8 (2d Cir. 1981) (finding that "injuries to United States commerce which reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation" may form the basis of an antitrust action in federal court). Despite *Den Norske*, the *Kruman* court squarely found that "an interpretation centered on whether the plaintiff has suffered domestic injury cannot be squared with the text of the FTAIA." 284 F.3d at 396 (referring at the end of this discussion to Judge Higginbotham's dissenting opinion in *Den Norske*). It noted, as further textual support for its reading of the statute, that the final sentence of the FTAIA would be superfluous if the *Den Norske* reading were adopted. *Id.* (That sentence provides that if the Sherman Act applies to foreign conduct only because the conduct affects U.S. exports, then "sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States." 15 U.S.C. § 6a.)

In addition to the points on which the *Kruman* court relied, plaintiff MG has argued that the use of the indefinite article "a" in the FTAIA, § 6a(2), where it says "give rise to *a* claim," implies that the claim need not be tied

so closely to the U.S. effects. The defendants' reading would be more compelling, it asserts, had the definite article "the" been used in that phrase instead. See also *Den Norske,* 241 F.3d at 431 (Higginbotham, J., dissenting) (Noting that even though the plaintiff Statoil was a foreign company, "it was injured by the same acts of defendants that injured American plaintiffs," who were permitted to recover for their losses.). A violation of the Sherman Act, MG also points out, does not depend on the existence of an injury to a private plaintiff. The U.S. government and the state attorneys general also have the right to enforce the Sherman Act, and they are equally subject to the subject matter jurisdiction rules in the FTAIA. (Indeed, particularly if the FTAIA is a statute defining the subject matter jurisdiction of the courts, as this court has now held in *United Phosphorus*, *supra*, its standards surely apply to all plaintiffs authorized to sue under the statute, including governmental plaintiffs.)

Although we need not come to a definitive resolution of the issue in this case, the *United Phosphorus* result appears to point in the direction of the approach taken by the D.C. and Second Circuits. But we reserve the question for another day, because in our view the result in the case now before us would be the same no matter which side of the debate we joined. These plaintiffs have not only alleged that the defendants engaged in a conspiracy that had direct, substantial, and reasonably foreseeable effects in U.S. domestic commerce; they also alleged that they themselves suffered injury in the United States as a result of physical copper transactions that took place within the United States or copper futures transactions on a U.S. exchange. That is enough, we believe, to satisfy even the panel majority in *Den Norske.*

Sumitomo argues that MG alleges only a ripple effect on the U.S. market that indirectly resulted in higher prices

for Comex New York buyers, similar to that alleged in *de Atucha v. Commodity Exchange, Inc.*, 608 F.Supp. 510 (S.D.N.Y. 1985). We are certainly not bound by *de Atucha*, which is a district court opinion from another circuit, but beyond that technicality, we do not find *de Atucha* similar enough to be useful as persuasive authority. In *de Atucha*, the district court did not consider the issue of jurisdiction because the complaint was dismissed for lack of standing under the FTAIA. The plaintiff first alleged a conspiracy artificially to inflate the price of silver on the Comex. Next, he claimed that the price of silver on the Comex influenced the LME contracts he had actually purchased. The court found that de Atucha lacked standing to sue, noting that because the plaintiff's "theory of antitrust injury depends upon a complicated series of market transactions . . . antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy" in the U.S. market. *Id.* at 515-16. We have no reason to disagree with this evaluation of the remoteness of de Atucha's injury. In the present case, however, the plaintiffs have not attempted to rely on the way in which Comex prices might have influenced LME prices; they claim instead that they directly purchased LME contracts and physical copper.

In support of those allegations, the plaintiffs submitted affidavits from Philip Bacon, president of MG, Michael Farmer, CEO of MG, and Craig Young, president of MGUK. The affidavits described the copper market, the plaintiffs' participation in the market, their injury resulting from the copper conspiracy, and how their injuries are tied to the United States. When these factors, as alleged by the plaintiffs, are considered together, the plaintiffs have adequately alleged an injury in the U.S. market. The United States is the single largest copper consumer in the world and the second largest copper producer. MG

and MGUK purchased copper futures on the LME through brokers in New York. MGUK delivered copper to the LME warehouse in California. These transactions were possible even after the close of business in London, and the trades post real time. (This is therefore not a case like *Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd.*, 299 F.3d 281 (4th Cir. 2002), which found that the FTAIA did not apply at all because only import commerce was affected, and then found that the "links to the United States [were] mere drops in the sea of conduct that occurred in Southeast Asia (and around the world)." *Id.* at 295. Here the FTAIA does apply, and there are allegations of substantial effects in the United States.)

The district court found this evidence to be insufficient to show an effect on the U.S. market, explaining that "neither the fact that American merchants and traders may trade on the LME through American investment banks that go through official LME brokers in London nor the fact that the LME accepts delivery of copper from all major American copper producers makes the LME an American market." *In re Copper Antitrust Litig.*, 117 F.Supp. at 887. We find this conception of the U.S. market to be too narrow. Indeed, if it were correct, it is hard to see how the CFTC could regulate the New York traders who work with the LME, even though the agency certainly does so.

In a global economy, where domestic and foreign markets are interrelated and influence each other, it is sometimes difficult to put strict economic boundaries around any particular country. Indeed, this fact has driven the antitrust agencies of the world to create a new International Competition Network, under whose auspices they are attempting to achieve better coordination of international competition policy and enforcement. See, *e.g.*, R. Hewitt Pate, Acting Assistant Attorney General, Antitrust Division, U.S. Department of Justice, "The DOJ Interna-

tional Antitrust Program—Maintaining Momentum," Speech before the ABA Section of Antitrust Law, 2003 Forum on International Competition Law, New York City, February 6, 2003, available at <http://www.usdoj.gov/atr/ public/speeches/200736.pdf>. A global conspiracy to inflate prices could have anticompetitive effects on the U.S. economy whether the conspiracy occurred within the United States or abroad.

There are undoubtedly limitations to the reach of any country's laws, and U.S. courts have been grappling with where to draw those limits. See, *e.g.*, *Ferromin Int'l Trade Corp. v. UCAR Int'l, Inc.*, 153 F.Supp.2d 700 (E.D. Pa. 2001) (Injury on the worldwide market is not enough, instead, the injury must occur in the United States to state a claim under the FTAIA.); *Dee-K Enters.*, *supra.* In this case, however, we have no need to come to some ultimate conclusion about where U.S. interests end and those of other countries take over. The plaintiffs before us have alleged more than a global conspiracy that has significant effects in the United States. The plaintiffs traded in New York, using the assistance of New York offices; those trades are regulated by the CFTC; and the trades were completed only after the New York traders contacted their LME counterparts for matching purposes. Moreover, the plaintiffs delivered physical copper to LME warehouses in the United States. Although there is a "matching" process with brokers in London, and the trades are ultimately cleared through the clearinghouse in London, it would be inappropriate to ignore the presence of actual trading on copper futures in the United States and the deliveries of physical copper to the California warehouse. These ties are enough to satisfy the standards imposed by the FTAIA. They demonstrate that MG and MGUK were injured in the U.S. market and that the alleged foreign activities had a direct, substantial, and reasonably foreseeable effect on U.S. non-import commerce.

After finding the plaintiffs had not satisfied the FTAIA's jurisdictional standard, the district court *sua sponte* also granted the defendants' motion to dismiss on the theory that the plaintiffs could not satisfy the requirements of so-called antitrust standing. Plaintiffs argue that the district court improperly addressed this issue. It is true, of course, that a district court may dismiss a case *sua sponte* for lack of Article III standing if it finds that the plaintiff has not suffered injury-in-fact. *Johnson v. Allsteel*, 259 F.3d 885, 887-88 (7th Cir. 2001). In *Stewart Title Guaranty Co. v. Cadle Co.*, 74 F.3d 835 (7th Cir. 1996), the court determined that it was error for a court to dismiss a claim *sua sponte* if it deprived "the losing party of the opportunity to present arguments against dismissal." *Id.* at 836. Here, the question whether the plaintiffs have suffered antitrust injury (which is to say whether the kind of injury they have asserted is the type the statutes were intended to address), whether their injuries are too remote from the conspiracy to permit recovery, and whether the conspirators are liable for all overcharges made possible by the conspiracy (no matter whose copper was being purchased) are distinct from Article III and prudential standing. The right to recover for such damages also presents a question distinct from the FTAIA inquiry.

In our view, this array of issues related to the right of these particular plaintiffs to sue under the antitrust laws must be reconsidered in light of our opinion in *Loeb Industries v. Sumitomo*. We thus decline the defendants' invitation to affirm the result below on this alternate ground. On remand, the district court should revisit the question whether these plaintiffs, who are futures traders, can recover any damages, with careful attention to the particular type of damages they are asserting.

### III

The district court's judgment for the defendants is REVERSED, and the case is remanded for further proceedings in accordance with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*