In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1712

MINN-CHEM, INCORPORATED, et al.,

*Plaintiffs-Appellees,*

*v.*

AGRIUM INCORPORATED, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 6910—**Ruben Castillo**, *Judge.*

ARGUED JUNE 3, 2010—DECIDED SEPTEMBER 23, 2011

Before MANION, EVANS*, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge.* This multi-district antitrust class action alleges a global conspiracy to raise the price of potash, a mineral used primarily in agricultural fertilizer.

---

* Circuit Judge Terence T. Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

Most of the world's potash reserves are concentrated in three countries—Canada, Russia, and Belarus—and the defendants are leading producers whose mining operations are located in those countries. The plaintiffs are direct and indirect potash purchasers in the United States. They allege that the Canadian, Russian, and Belarusian producers operated a cartel through which they fixed potash prices in Brazil, China, and India, and the inflated prices in these overseas markets in turn influenced the price of potash sold in the United States. The defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing first that the district court lacked subject-matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, and alternatively, that the complaint did not satisfy the pleading requirements of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). The district court denied the motion but certified its order for immediate review. *See* 28 U.S.C. § 1292(b). We accepted review and now reverse.

As relevant here, the FTAIA limits the extraterritorial reach of the Sherman Antitrust Act to foreign anticompetitive conduct that either involves U.S. import commerce or has a "direct, substantial, and reasonably foreseeable effect" on U.S. import or domestic commerce. 15 U.S.C. § 6a. In *United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942 (7th Cir. 2003), we sat en banc to address whether the FTAIA's limitations are jurisdictional or instead are elements of a Sherman Act claim that implicates offshore anticompetitive conduct. We

held that the FTAIA's requirements are jurisdictional. *Id.* at 950-52. A substantial minority of the court disagreed, *see id.* at 953-54 (Wood, J., dissenting), and the dissent's approach has since prevailed in the Supreme Court, although in decisions involving other statutes. *See Morrison v. Nat'l Austl. Bank*, 130 S. Ct. 2869, 2876-77 (2010); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515-16 (2006). These intervening developments suggest that *United Phosphorus* may be ripe for reconsideration, but we need not undertake that task here. Whether it blocks jurisdiction or establishes an element of a Sherman Act claim, the FTAIA applies here to bar this antitrust suit. The defendants are entitled to dismissal under either Rule 12(b)(1) *or* 12(b)(6).

## I. Background

Two separate groups of plaintiffs filed nearly identical antitrust class actions against the world's leading potash producers. The first group—Minn-Chem, Inc.; Gage's Fertilizer and Grain, Inc.; Kraft Chemical Company; Shannon D. Flinn; Westside Forestry Services; and Thomasville Feed & Seed, Inc.—sued on behalf of themselves and all others who purchased potash products in the United States directly from the defendants. The second group—Kevin Gillespie, Gordon Tillman, Feyh Farms Company, William H. Coaker, Jr., and David Baier—sued on behalf of themselves and all others who purchased potash products in the United States indirectly from the defendants.

The defendants are seven companies whose principal mining operations are located in Canada, Russia, and Belarus, where most of the world's potash reserves are found: Agrium Inc., Potash Corporation of Saskatchewan Inc. ("PCS"), The Mosaic Company, JSC Uralkali, JSC Silvinit, JSC Belarusian Potash Company ("BPC"), and JSC International Potash Company ("IPC"). Agrium, PCS, and Mosaic operate potash mines in the Canadian province of Saskatchewan. These three companies own Canpotex Ltd., a Canadian corporation that is named as a coconspirator but not as a defendant. Canpotex is a joint export marketing and distribution company tasked with coordinating the offshore sales of the potash supply of each of its three stakeholders. Canpotex is specifically structured to exclude the U.S. and Canadian markets. Export marketing through Canpotex is explicitly authorized and encouraged by Canadian law. In other words, Canpotex's coordination of Canadian potash exports is lawful under the domestic law of that country.

The remaining defendants conduct their mining operations in Russia and Belarus. Silvinit is a Russian company, and IPC is the exclusive international distributor of Silvinit's potash product. BPC is the exclusive international distributor for Uralkali (a Russian company headquartered in Moscow) and RUE PA Belaruskali. Uralkali and Belaruskali jointly own BPC. Belaruskali was initially named as a defendant, but because it is owned by the Republic of Belarus, it was dismissed from the suit under the Foreign Sovereign Immunities Act. *See* 28 U.S.C. §§ 1604 *et seq.*

We take the facts from the amended consolidated class-action complaint. The class period covered by the complaint is July 1, 2003, to the present. As of 2008 the named defendants accounted for roughly 71% of the world's potash supply. The complaint generally alleges a conspiracy to restrict output and fix prices of potash at artificially high levels in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] From 2003 to 2008, potash prices in the United States increased by a staggering amount—roughly 600%. This dramatic increase came after years of relatively stable pricing. The plaintiffs contend that the spike in prices cannot be explained by rising production costs or increased demand; indeed, they claim that demand was falling for much of this period. They also contend that the sharp increase in prices cannot be attributed to production shortages; the defendants are alleged to have plenty of excess capacity. The plaintiffs allege that the surge in prices was instead the result of an agreement by the defendants to jointly restrict output and increase prices as exemplified by parallel business conduct in three foreign markets—Brazil, China, and India.

The factual section of the complaint begins with a general description of the characteristics of the potash market, which the plaintiffs allege are conducive to

---

[1] As we have noted, the direct and indirect purchasers asserted substantially identical claims under the Sherman Antitrust Act, 15 U.S.C. § 1. The indirect purchasers also asserted a host of state-law claims against the defendants; these claims are not before us on this interlocutory appeal.

forming a stable cartel. Potash is an element mined from naturally occurring ore deposits and used primarily as an ingredient in agricultural fertilizer. It is (for the most part) a homogeneous product, but only a handful of countries possess significant quantities of this valuable resource. Accordingly, the potash industry is an oligopoly characterized by high market concentration. The Canadian province of Saskatchewan is the leading producer, accounting for roughly one-third of global production. Russia and Belarus are the next biggest exporters. Since potash accounts for a relatively small percentage of total crop-production costs and has no obvious substitutes, demand for the product is relatively inelastic, although not entirely so because farmers can opt to reduce the amount of fertilizer they use in a given season. Also, the majority of production costs for potash are variable rather than fixed; therefore, producers face less pressure in a given year to hit any particular output target in order to recoup their expenses. Finally, there are high barriers to entry into the potash business. In addition to first finding a promising source of potash deposits, any potential entrant would incur approximately $2.5 billion in start-up costs over a five-to-seven-year development period before production could commence.

With these background allegations in place, the complaint proceeds to explain that "the potash industry is marked by a high degree of cooperation" providing "opportunities to conspire and share information." In this regard, the complaint notes that PCS, Agrium, and Mosaic have access to one another's sensitive informa-

tion about production capacity through their joint owner-ship of Canpotex. Canpotex also offers these three defendants a convenient forum to discuss matters of pricing and output. Moreover, Canpotex previously had a joint marketing agreement with Uralkali. The complaint also alleges that the interests of Uralkali and Silvinit are aligned because they share a common, influential shareholder, Dmitry Rybolovlev, who is alleged to own 66% of Uralkali and 20% of Silvinit's voting stock. The plaintiffs also allege that the defendants participate in an "exchange program of mutual visits" and "these visits have provided opportunities to conspire and exchange highly sensitive competitive information." Finally, the defendants meet together at the annual conference of the International Fertilizer Industry Association. The complaint alleges that the "major potash manufacturers" announced price increases during the Association's 2007 conference. Also, a PCS executive is alleged to have publicly complimented BPC (the Belarusian exporter) for showing "tremendous discipline . . . in terms of managing supply in the marketplace."

From these allegations about general "opportunities to conspire" the complaint moves on to allege specific parallel business conduct consisting of reductions in output designed to keep prices artificially high and parallel increases in prices. Some of these allegations are general and others specific to certain foreign markets. For example, the complaint alleges that as global demand for potash declined in the second half of 2005, the defendants "jointly restricted" the output of

potash for the purpose of maintaining an artificially high price. In the last two months of 2005, PCS, the world's leading potash producer, announced the shutdown of three of its mines. These shutdowns resulted in the removal of 1.34 million tons of potash from the market. At the same time, Mosaic also announced a temporary, 200,000-ton reduction in potash production. Uralkali, Belaruskali, and Silvinit followed suit with reductions of their own in the first half of 2006. These production cuts continued through 2008 despite the fact that the defendants maintained sizeable excess capacity.

The complaint also points to an event in October of 2007, when Silvinit announced that a sinkhole at one of its mines might cause a long-term disruption in production at that location. Within a day of the announcement, PCS, Uralkali, Agrium, and BPC (but apparently not Mosaic) announced that they would suspend new sales in the wake of Silvinit's disclosure. Roughly two weeks later, Silvinit announced that the sinkhole was not as severe as initially feared and that the mine in question would return to business as usual. At this point the other companies ended their self-imposed moratorium on new sales. The complaint alleges that

> [t]he joint suspension of sales by PCS, Uralkali, Agrium and BPC during the shutdown by Silvinit, a supposed competitor, makes no economic sense absent a cartel. Had the market truly been competitive, defendants would have the incentive to *increase*, not suspend, production to take advantage of their

competitor's reduced output and thus gain market share.

The complaint's other factual allegations of parallel conduct focus exclusively on three foreign markets—Brazil, China, and India—giving examples of supply and pricing activity by the defendants beginning in 2003. For example, the complaint alleges that in "early 2003, IPC announced that it would increase its potash prices by eight dollars per ton. Within a month Canpotex announced that it would seek a nearly identical price increase for its sales in Brazil." Then, "[b]y mid-2003 all suppliers to Brazil were announcing that they had achieved an increase of eight dollars per ton." Later, in 2004, "IPC announced a price increase to buyers in India," and "[s]hortly after these announcements, PCS announced two five dollar per ton increases within a five week period." Other allegations focus on claimed coordination of supply restrictions in these countries. For example, the complaint alleges that potash demand dropped by 20.9% in Brazil during 2005 and the Russian and Belarusian defendants reduced their combined exports to that country by the same percentage; Canpotex followed suit and cut its Brazilian exports "by almost exactly the same percentage." Plaintiffs also allege that Canpotex and BPC jointly restricted exports to China in an effort to boost the price of potash in that country.

Notably, all of the anticompetitive conduct identified in the complaint is alleged to have occurred outside the United States. The only link between the activities

of this wholly foreign conspiracy and the U.S. potash market are general allegations that potash prices in the United States were adversely affected by the coordinated price hikes in Brazil, China, and India. That is, the complaint alleges that the cartelized prices in these foreign markets served as a "benchmark" for potash sales in this country.

The defendants moved to dismiss the Sherman Act claim pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction under the FTAIA and alternatively for failure to state a claim upon which relief can be granted. In a thorough opinion, the district court denied the motion but certified its order for immediate appeal under 28 U.S.C. § 1292(b).

## II. Discussion

As they did in the district court, the defendants make two arguments on appeal, one narrower and the other more broadly based. First, because the plaintiffs have alleged an offshore price-fixing conspiracy, the defendants argue that the FTAIA, 15 U.S.C. § 6a, deprives the court of subject-matter jurisdiction over this suit, requiring dismissal under Rule 12(b)(1). Alternatively, they argue that the complaint does not plausibly state an antitrust claim under the pleading standards announced in *Twombly* and *Iqbal* and must be dismissed under Rule 12(b)(6). The plaintiffs' complaint, they maintain, alleges at most only innocent parallel business conduct: "Even 'conscious parallelism,' a common reaction of

'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions,' is 'not in itself unlawful.'" *Twombly,* 550 U.S. at 553-54 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227 (1993) (alterations in *Twombly*)).

There may well be reason to doubt the complaint's sufficiency under *Twombly*.[2] The "crucial question" in a Sherman Act § 1 claim "is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or expresss." *Id.* at 553 (quotation marks omitted). "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556-57. The plaintiffs' complaint focuses mostly on allegations of parallel output and pricing conduct in the Brazilian, Chinese, and Indian potash markets; "when allegations of parallel conduct are set out in order to make a § 1

---

[2] Indeed, the Eighth Circuit, sitting en banc, rejected a very similar Sherman Act claim brought against the members of Canpotex, then comprised of a slightly different mix of principals, alleging a conspiracy to fix potash prices between 1987 and 1994. *See Blomkest Fertilizer, Inc. v. Potash Corp.*, 203 F.3d 1028, 1033-38 (8th Cir. 2000). Although *Blomkest* was before the Eighth Circuit in a different procedural posture (the district court had entered summary judgment in favor of the defendants), the court's analysis of the adequacy of the plaintiffs' evidence of parallel conduct and interfirm communications in the potash industry supports the defendants' arguments here.

claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557; *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010) (describing the "kind of 'parallel plus' behavior" an antitrust plaintiff must allege to survive dismissal post-*Twombly*).

But the threshold issue in this case concerns application of the FTAIA's limits on the Sherman Act's reach. On this point we agree with the defendants that the FTAIA requires dismissal; therefore, we need not decide the question of the broader sufficiency of the complaint under *Twombly* and *Iqbal*.

### A. The FTAIA and the Effect of *Arbaugh* and *Morrison* on *United Phosphorus*

It is well-understood that "American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986). "The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce." *Id.* at 583 n.6. Before the FTAIA was enacted, this domestic-effects limiting principle existed as a matter of caselaw. *See United Phosphorus*, 322 F.3d at 946-47. The FTAIA, adopted in 1982, incorporates the principle. More specifically, the FTAIA provides that the Sherman Act:

> shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and rea-sonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under [the Sherman Act].

15 U.S.C. § 6a.

Though awkwardly phrased, "[t]he FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004). The Act first states a broad general rule that the Sherman Act "shall not apply" to conduct involving foreign trade or commerce. It then carves out several exceptions. As relevant here, the FTAIA restores the Sherman Act's applicability to two categories of foreign anticompetitive conduct: (1) foreign anticompetitive conduct "involving . . . [U.S.] import trade or import commerce"; and (2) foreign anticompetitive conduct that "has a direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import trade or commerce. 15 U.S.C. §§ 6a & 6a(1)(A).

In *United Phosphorus*, this court sat en banc to consider whether the FTAIA is properly understood to create a jurisdictional requirement or, rather, an extra element of a Sherman Act claim when the plaintiff alleges a foreign antitrust conspiracy. 322 F.3d at 944. The court was closely divided on the question. Relying primarily on earlier opinions treating the statute's requirements as jurisdictional, the en banc majority held that the FTAIA has the status of a jurisdictional provision. *Id.* at 946-48. Judge Wood dissented, joined by three colleagues; her dissent focused on the text of the statute, which contained no "hint that the Congress was attempting to strip federal courts of their competence to hear and decide antitrust cases with a foreign element." *Id.* at 954 (Wood, J., dissenting). The dissent argued that the plain statutory language, which does not speak in jurisdictional terms, "supports the position that this is an element of the [Sherman Act] claim, especially when it is contrasted to true jurisdiction-stripping statutes." *Id.*

Subsequent Supreme Court decisions—notably *Arbaugh* and *Morrison*—have taken the dissent's approach to the question, although in different statutory contexts. *Arbaugh* addressed whether the "numerical qualification contained in Title VII's definition of 'employer' affects federal-court subject-matter jurisdiction or, instead, delineates a substantive ingredient of a Title VII claim for relief." 546 U.S. at 503. The Supreme Court concluded that this numerical threshold was not a requirement for subject-matter jurisdiction but, rather, was an element of a Title VII claim. *Id*. at 516. The Court explained that a statutory provision prescribing a

"threshold limitation on a statute's scope" establishes a jurisdictional limitation only if the statutory text clearly says so:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character. Applying that readily administrable bright line to this case, we hold that the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue.

*Id*. at 515-16 (citation omitted).

In *Morrison* the Court considered the question of the extraterritorial reach of § 10(b) of the Securities and Exchange Act of 1934. 130 S. Ct. at 2875. The Second Circuit had treated this as a dispute over subject-matter jurisdiction to be decided under Rule 12(b)(1), but the Court made it clear it was a merits question. *Id.* at 2877. Noting that the Second Circuit was "hardly alone" in mischaracterizing the issue, the Court restated the question: "[T]o ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case." *Id.* (quotation marks omitted). Even so, because "nothing in the analysis of the courts below turned on the mistake," the Court said that remand was unnecessary; "a remand would only re-

quire a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion," so the Court proceeded to the merits question of whether the plaintiffs' allegations stated a claim. *Id.*

We have recently applied *Arbaugh*'s "clear statement" rule outside the Title VII context, *see Miller v. Herman*, 600 F.3d 726, 732 (7th Cir. 2010), and the plaintiffs contend that the FTAIA should be subject to the same analysis. This calls *United Phosphorus* into question. The defendants' response is twofold. They first argue that *United Phosphorus* can be distinguished from *Arbaugh* based on the FTAIA's concern for international comity; this argument is in tension with the Court's approach in *Morrison*, which also concerned a question of the extraterritorial reach of a federal statute. In the alternative, they argue that because the result is the same either way, we need not attempt to reconcile *United Phosphorus* with *Arbaugh* and *Morrison*; dismissal is required whether the FTAIA states a jurisdictional requirement, as *United Phosphorus* held, *or* an element of the Sherman Act claim.

We agree with the second of these arguments. As we have noted, in *Morrison* the Court found it unnecessary to order a remand to apply "a new Rule 12(b)(6) label [to] the same Rule 12(b)(1) conclusion." 130 S. Ct. at 2877. Here, the defendants moved to dismiss for lack of jurisdiction *and* failure to state a claim; our substantive review of the FTAIA is no different whether viewed through the lens of Rule 12(b)(1) or Rule 12(b)(6). For reasons we will explain, we conclude that the FTAIA bars this suit and therefore dismissal is required

whether the statute is properly construed to state a juris-dictional requirement *or* an element of the plaintiffs' Sherman Act claim. Accordingly, we need not decide whether *United Phosphorus* survives *Arbaugh* and *Morrison*.[3] We note the issue and reserve it for another day.

### B.  Applying the FTAIA's Requirements to the Plaintiffs' Complaint

As we have explained, the FTAIA limits the Sherman Act's extraterritorial reach by making it generally inap-plicable to foreign anticompetitive conduct, subject to certain enumerated exceptions. 15 U.S.C. § 6a. That is, the FTAIA "initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach." *Empagran*, 542 U.S. at 162. "It then brings such conduct back within the Sherman Act's reach," *id.*, *if* the foreign anticompetitive conduct is "conduct involving . . . import commerce" or has "a direct, substantial, and reasonably foreseeable effect" on domestic or import commerce, 15 U.S.C. § 6a. To determine whether the plaintiffs have done enough at the pleadings stage to bring their claim within either of

---

[3] We noted that the Third Circuit has recently applied the *Arbaugh* clear-statement rule, overruled circuit precedent, and held that the FTAIA does not impose a jurisdictional limit but instead establishes an element of a Sherman Act claim, citing with approval the *United Phosphorus* dissent. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, No. 10-2288, 2011 WL 3606995 (3d Cir. Aug. 17, 2011).

these exceptions, we are required to evaluate their complaint in light of the "plausibility" pleading standard announced in *Twombly* and further explained in *Iqbal*:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Iqbal*, 129 S. Ct. at 1949 (quotation marks and citations omitted).

*Twombly* explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555. *Iqbal* reiterated this point: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 129 S. Ct. at 1949. Rather, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 1950. Accordingly, to avoid dismissal, the complaint must include sufficient factual content to support a plausible inference that the

defendants' alleged anticompetitive activity—all of which occurred overseas—either "involv[ed] . . . [U.S.] import trade or import commerce" or had a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce.

The district court held that the plaintiffs had alleged enough to proceed on the basis of the "import commerce" exception and therefore did not address the "direct effects" exception. The court reasoned that because the defendants import potash into the United States and were generally accused of conspiring to fix the price of potash globally, there was a sufficiently "tight nexus between the alleged illegal conduct and [d]efendants' import activities . . . to conclude that the former 'involved' the latter." This was error. "The FTAIA differentiates between conduct that 'involves' . . . [import] commerce, and conduct that 'directly, substantially, and foreseeably' affects such commerce. To give the latter provision meaning, the former must be given a relatively strict construction." *Carpet Group Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 72 (3d Cir. 2000) *overruled on other grounds* in *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, No. 10-2288, 2011 WL 3606995 (3d Cir. Aug. 17, 2011).

The flaw in the district court's reasoning is that it essentially conflates the "import commerce" exception and the "direct effects" exception. If foreign anticompetitive conduct can "involve" U.S. import commerce even if it is directed entirely at markets overseas, then the "direct effects" exception is effectively rendered meaningless. Under the district court's reading of the statute, a foreign

company that does *any* import business in the United States would violate the Sherman Act whenever it entered into a joint-selling arrangement overseas *regardless* of its impact on the American market. This would produce the very interference with foreign economic activity that the FTAIA seeks to prevent. *See Empagran*, 542 U.S. at 161.

As the Third Circuit has noted, the FTAIA's "import commerce" and "direct effects" exceptions are distinct and capture different kinds of foreign anticompetitive conduct. *See Turicentro, S.A. v. Am. Airlines Inc.,* 303 F.3d 293, 301-02 (3d Cir. 2002) *overruled on other grounds* in *Animal Science*, 2011 WL 3606995. The import-commerce exception captures foreign anticompetitive conduct (thus bringing it back within the Sherman Act's reach) *if* the overseas anticompetitive conduct actually "involves" the U.S. import market. The direct-effects exception captures foreign anticompetitive conduct that has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce *regardless* of whether the overseas anticompetitive conduct actually "involves" the U.S. import market. *Id.*

Thus, the relevant inquiry under the import-commerce exception is "whether the defendants' alleged anticompetitive behavior 'was directed at an import market.'" *Animal Science*, 2011 WL 3606995, at *5 (quoting *Turicentro*, 303 F.3d at 303). Contrary to what the district court seemed to think, it is not enough that the defendants are engaged in the U.S. import market, though that may be relevant to the analysis. *Id.* Rather, "the import trade or commerce exception requires that the defendants' [foreign

anticompetitive] conduct target [U.S.] import goods or services." *Id.*

Here, the complaint contains no factual allegations to support application of the import-commerce exception, properly understood. It does not, for example, allege any specific facts to support a plausible inference that the offshore defendants agreed to an American price or production quota for potash. Nor does it allege, for that matter, that the defendants agreed to worldwide production quotas for all members of the conspiracy or that a global cartel price was ever set. The complaint's specific factual allegations describe anticompetitive conduct aimed at the potash markets in Brazil, China, and India—not the U.S. import market. True, the complaint generally alleges that the "defendants conspired to coordinate potash prices and price increases so as to fix, raise, maintain, and stabilize the price at which potash was sold in the United States at artificially inflated and anticompetitive levels." But this wholly conclusory statement is akin to a recitation of the elements of the Sherman Act claim, which is insufficient under *Twombly* and *Iqbal*. We conclude that the complaint cannot survive dismissal based on the FTAIA's import-commerce exception and must stand or fall based on the direct-effects exception alone.

We have not yet had occasion to consider the meaning of the term "direct" in the FTAIA,[4] but the Ninth Circuit,

---

[4] In *Metallgesellschaft AG v. Sumitomo Corp. of America*, 325 F.3d 836, 842 (7th Cir. 2003), we concluded that the plaintiffs had

(continued...)

relying on the Supreme Court's interpretation of a nearly identical term in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), has held that an effect is "direct" if "it follows as an immediate consequence of the defendant's activity." *United States v. LSL Biotechs.*, 379 F.3d 672, 680 (9th Cir. 2004) (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)). "An effect cannot be 'direct' where it depends on . . . uncertain intervening developments." *Id.* at 681. We find this definition compelling.

Despite its length and many specific factual allegations, the complaint offers very little of substance concerning the relationship between the defendants' alleged overseas anticompetitive conduct and the American domestic market for potash. Recall that the complaint builds its case for conspiracy around the characteristics of the potash industry that make it particularly susceptible to collusion. The complaint alleges, moreover,

---

[4] (...continued)

sufficiently alleged that the defendants' anticompetitive conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, but did not elaborate on the meaning of the word "direct." *Metallgesellschaft* involved allegations that the defendants had illegally manipulated the price of copper contracts traded on the London Metals Exchange. This conduct immediately and unavoidably increased the price at which copper was exchanged in the United States. Indeed, we pointedly observed that "[t]he plaintiffs before us have alleged more than a global conspiracy that has significant effects in the United States." *Id*.

that the conspiracy was facilitated by the close working relationship among the Canadian defendants (via Canpotex) and among all the defendants through the International Fertilizer Industry Association and an "exchange program of mutual visits." Although the complaint describes in some detail certain parallel output and pricing conduct in the Brazilian, Chinese, and Indian markets, it does little to elaborate on how this conduct actually impacts the American potash market.

As we have noted, the complaint does not allege that the defendants agreed to worldwide production quotas or a global cartel price, nor are there allegations that the defendants ever imposed a price or supply quota on the American potash market specifically. In the section of the complaint entitled "Impact of Defendants' Conduct on United States Prices," the plaintiffs allege that "[t]he vast majority of potash sales in the United States are made by PCS, Mosaic, Agrium and BPC at prices that are set according to benchmarks established by defendants based on sales in India, China and elsewhere." This is explained in slightly more detail elsewhere in this section of the complaint:

> Defendants negotiate term contracts for purchases of potash throughout the world. Agreements with buyers in Brazil, India and China typically are made first, and the prices established in those markets directly influence prices in other major markets. Once defendants establish these prices, they use them to determine potash prices in other major markets, including the United States. The prices for cartelized

term contracts become benchmarks for spot market sales [including those in the United States], which typically are higher than those of term contracts.

The problem with these generalized allegations is the absence of specific factual content to support the asserted proposition that prices in China, India, and Brazil serve as a "benchmark" for prices in the United States and that this benchmark, if it exists, has a strong enough relationship with the domestic potash market to raise a plausible inference that the defendants' foreign anticompetitive conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic or import commerce. That is, the complaint only generally alludes to a link between the cartelized prices in these three foreign markets and American potash prices. Elsewhere in the complaint the plaintiffs do claim that:

> Through much of 2006, price increases were muted as purchasers awaited the outcome of negotiations over a proposed increase to customers in China. After potash producers reached an agreement on a price increase to customers in China in late July 2006, and Brazil later in 2006, potash prices in the United States increased as well, as defendants knew and intended.

But this general allegation does not add much. Prices of potash were increasing around the world throughout most of the class period. This allegation only hints at a relationship between Chinese and American prices; it does not suffice to raise a plausible inference that price increases in China or Brazil "directly" and "substantially"

affected prices in the United States. Something more specific is required in order to successfully plead a "direct effects" case. To satisfy the requirements of *Twombly* and the FTAIA, the plaintiffs needed to provide enough factual content—that is, they needed to provide some factual description of the way in which prices in China, Brazil, and India serve as a "benchmark" for American prices—to permit a plausible inference that the defendants' anticompetitive conduct in these foreign markets has a direct, substantial, and reasonably foreseeable effect on potash prices in the United States.

The "something more" is not supplied by the complaint's citation to a remark by one unnamed "analyst" who is alleged to have stated that "the barriers that we have seen in the past between domestic and international prices have just fallen down. We're now participating in a global fertilizer market." The allegation of a "global fertilizer market" is of course conclusory and unhelpful, and the complaint provides no context whatsoever for this statement that might make it more meaningful. In the end, the most specific allegation in the section of the complaint describing the impact of the defendants' overseas conduct on the American potash market is this one:

> Defendants knew and intended that their global conspiracy would directly impact prices of potash on world markets and within the United States. Representatives of Uralkali, in a presentation to analysts in December 2007, set forth each step in the chain of events resulting in increased prices throughout

the world and in the United States: "[1] contract settlement in the key markets immediately tied up volumes of potash producers . . . [2] causing demand competition on SPOT markets followed by increase in prices . . . [3] conclusion of Indian contract on the back of the SPOT markets' growth—even less volume is available . . . [4] boom on SPOT market continues stimulating increased Chinese discount and a stronger reason to bring it down in 2008."

This chain-of-events allegation is cryptic and relies on too many intervening variables to suffice as support for application of the FTAIA's direct-effects exception. Even taking into account "the nature of a global market," the allegations here amount to "nothing more than what courts have termed a 'ripple effect' on the United States domestic market, and the FTAIA prevents the Sherman Act from reaching such 'ripple effects.'" *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006). Ultimately, the connection asserted in the complaint between the alleged cartelized prices of potash overseas and the domestic price of potash is too speculative and indirect to state an actionable claim under the FTAIA's direct-effects exception.

For all the foregoing reasons, we conclude that the complaint does not contain sufficient factual content to plead a plausible "direct, substantial, and reasonably foreseeable" connection between the alleged foreign anticompetitive activity and the domestic potash mar-ket. Because the complaint fails to allege facts sufficient to satisfy the direct-effects exception of the

FTAIA, dismissal is required. Accordingly, we vacate the district court's order denying the defendants' motion to dismiss and remand with instructions to dismiss the plaintiffs' Sherman Act claim.

VACATED AND REMANDED
WITH INSTRUCTIONS.